```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

          v.                               16 Cr. 91 (PKC)

SCOTT TUCKER,
TIMOTHY MUIR,

               Defendants.                 Trial

------------------------------x
                                           September 11, 2017
                                           4.45 p.m.
Before:
                    HON. P. KEVIN CASTEL

                                           District Judge

                         APPEARANCES

JOON H. KIM
     Acting United States Attorney for the
     Southern District of New York
BY:  NIKETH V. VELAMOOR
     HAGAN C. SCOTTEN
     SAGAR K. RAVI
     Assistant United States Attorneys

FREEMAN NOOTER & GINSBERG
     Attorneys for Defendant Tucker
BY:  LEE A. GINSBERG
     NADJIA LIMANI
        -and-
STAMPUR & ROTH
BY:  JAMES M. ROTH

BATH & EDMONDS, P.A.
     Attorneys for Defendant Muir
BY:  THOMAS J. BATH
        -and-
BEVERLY VAN NESS
```

1         THE COURT:  Are there any jurors, potential jurors
2 remaining in the courtroom?  If so, please raise your hand.
3         There do not appear to be any.
4         Unless there is something we need to discuss, see you
5 tomorrow morning.
6         Yes, sir.
7         MR. SCOTTEN:  Your Honor, so there is at least one
8 legal issue the government is aware of, and I think there may
9 be one the defendants are also concerned with, that we would
10 like the Court's ruling on before openings.  It doesn't have to
11 be now; we are not opening first thing tomorrow morning.  If
12 it's convenient for the Court, we can do it now or later.
13         THE COURT:  What is it?
14         MR. SCOTTEN:  The issue that the government is
15 concerned with is the scope of the Court's ruling on legal
16 evidence other than advice of counsel evidence.  We had a
17 discussion with Mr. Bath, and he has a different take on the
18 Court's ruling than we do.  So we thought it best to ask for
19 clarification because it may affect how the parties open.
20         As you know, we moved essentially to keep out all
21 legal evidence other than that within an advice of counsel
22 defense.  We argued it mostly about the defense expert, but our
23 belief was the Court granted our motion.  I am not sure exactly
24 what Mr. Bath's interpretation is, but I think he sees it more
25 narrowly.  I think the area of particular concern is, as you

1  know from our initial papers, your Honor, Mr. Muir's defense,
2  at least in part, appears to be there were other lawyers
3  involved here, generally; not that these lawyers came to me and
4  told me what I was doing was lawful, but just they were around,
5  the atmospheric impression of lawyers being there led me to
6  believe it's more lawful.  We don't think that's proper.  We
7  cited the reasoning in the Floury case, which I think is quite
8  persuasive.  We think the Court granted that motion, but if it
9  didn't, or if it granted it in part, we'd like to know.
10          THE COURT:  I think I granted it, but implementing it
11 is a different situation.  Because the nature of in limine
12 rulings, when you seek an in limine ruling, it has something of
13 an abstract quality to it because it's not always a ruling that
14 attaches to the admission or exclusion of a specific exhibit or
15 the specific testimony of a witness.
16          Let me hear from Mr. Bath.
17          MR. BATH:  Thank you, Judge.
18          Judge, it is our position that Mr. Muir has a good
19 faith defense, and I realize the Court hasn't made a final
20 ruling on that, you haven't heard all the evidence yet.  A part
21 of that good faith defense is that Mr. Muir was hired about
22 2006, began working on behalf of Mr. Tucker's entities, was
23 hired by Mr. Tucker, was later engaged by the tribes.  He did
24 his own research.  He did his own CLEs.  He came to his own
25 conclusions.  But part of his good faith defense is, he also

1    worked with other leading Native American firms in the country
2    who came to the conclusion that he came to, which was this was
3    a legal operation.
4             THE COURT:  Let me find out from the government.
5             Mr. Muir takes the stand and he says, I acted in good
6    faith.  I spent 49 hours on Westlaw searching and reading
7    cases.  I read the cases inside out.  I picked up the phone,
8    because I wasn't satisfied from my reading of the cases, and I
9    asked people who were knowledgeable in this area whether they
10   read the case the same way I did.  Is that inadmissible
11   evidence?
12            MR. SCOTTEN:  As the Court has phrased it, I don't
13   think so, your Honor.  Certainly, Mr. Muir can testify as to
14   the law he personally observed, that has been put on his state
15   of mind.  So I agree he can say, I spent 49 hours on Westlaw,
16   and based on that, I believe what I did was lawful.  It is more
17   problematic when he is essentially bringing in advice of
18   counsel, but not meeting the requirements of the defense.  I do
19   think those limits still apply.  He can't just say, I got an
20   abstract opinion on my ruling of --
21            THE COURT:  It's not an abstraction.  I suppose not
22   every lawyer gets to the bottom of a legal problem exclusively
23   by reference to what pops up on a Westlaw screen or a Lexis
24   screen.  So you might ask another assistant United States
25   attorney in your office about an issue.  You have read the

1   case.  This is the way I read the case.  Am I missing something
2   here?  That offhand doesn't strike me as objectionable.  I have
3   to hear what it is.  Maybe I haven't thought about it enough,
4   and maybe that's why I am asking the question here.  But my
5   reaction to that is that's lawful and permissible.
6            What doesn't sound to me to be admissible is to say,
7   you know when I arrived on the scene, there were a lot of
8   lawyers, who I guess they must have kicked the can, they were
9   working there, none of them had quit.  So I just, you know,
10  basically assumed that this must be legal because they are
11  members of the bar and they wouldn't be doing this if it was
12  illegal.  That sort of argument presented not by the testimony
13  of the defendant, but through somebody saying, well, were there
14  a bunch of lawyers around on the scene when he started working,
15  yeah, there were, is in my view not probative of any issue in
16  this case.
17           Mr. Bath, I invite you to tell me where you agree and
18  where you disagree.
19           MR. BATH:  I think it's a matter of Mr. Muir taking
20  the stand.  I think if he takes the stand, and he is going to
21  take the stand, and I am going to tell them that in opening
22  statement -- and I understand that risk that maybe he will
23  choose not to take the stand, and that's my own peril.  But I
24  think if he takes the stand and says -- actually, I would argue
25  the combination of the two would be allowable, Judge.

1             THE COURT:  I am not disagreeing with that.  I think
2    so also.
3             MR. BATH:  I see the Court is saying, if I was just
4    going to put that defense on in a vacuum, without Mr. Muir's
5    state of mind, I can't just stick that onto his state of mind
6    without him telling the jury that that was in fact his state of
7    mind.  So I don't think there is a disagreement here.  The
8    government can object when they think it's proper to object,
9    and the Court will rule upon whatever it is that is before the
10   Court.
11            THE COURT:  My offhand reaction is there is something
12   seriously wrong if a nonlawyer can present an advice of counsel
13   defense, but a lawyer can't say, I read the cases, I studied
14   the law, I formed my own opinion, and get to the same place.
15            Now, I understand the wrinkle on that.  As I said, you
16   can get your law exclusively from books, maybe exclusively from
17   conversations with lawyers, or maybe a combination of both,
18   which is how lawyers practice law, but that doesn't strike me
19   as running afoul of anything.  It's not an advice of counsel
20   defense per se, but it's a good faith defense based on
21   testimony.
22            You're entitled to cross-examine and say, No, you
23   didn't look at any of that case law.  You didn't spend 49 hours
24   on Lexis.  You didn't call these lawyers.  What are you talking
25   about?  You're allowed to cross-examine about that.  How can

1    you come to that conclusion given this, that or the other
2    thing?  I think that's fair game also.  But I am not offended
3    by the prospect of testimony coming out of the mouth of the
4    defendant, which the government has the right to cross-examine.
5             MR. SCOTTEN:  To be clear, neither are we.  There may
6    be some disagreements around the edges.  Our real concern was
7    the other category the Court is keeping out.  Other than the
8    defendant saying, based on what I observed personally, the
9    other "weren't there a bunch of other lawyers around?" kind of
10   defense.  So I think the Court's ruling is clear on that.
11            THE COURT:  Anything else?
12            MR. GINSBERG:  One administrative matter, your Honor.
13   Unfortunately, with the e-voucher system, we submitted Friday a
14   request for the transcript from the final pretrial conference
15   and approval for daily transcript.  I am not sure that it got
16   to the Court yet for the Court's signature, but until it
17   does --
18            THE COURT:  I orally approve it.
19            Let me see whether it's up there.  It may be up there
20   now.
21            You want expedited transcript, right?
22            MR. GINSBERG:  Yes, your Honor. And daily for the
23   trial.  That was just for the pretrial conference.
24            THE COURT:  It has been done.
25            See you tomorrow morning.

1                What else?
2           MR. GINSBERG:  One other quick thing.  We have asked a
3    number of times, and we have not been told for certain yet, who
4    the witnesses are for this week and the order of witnesses.  I
5    don't think we should have to keep asking over and over again.
6    It's the end of the day on Monday.
7           THE COURT:  When are you going to give Mr. Ginsberg an
8    answer?
9           MR. SCOTTEN:  I don't think Mr. Ginsberg had a chance
10   to talk to Mr. Roth.  I just told Mr. Roth at the end of the
11   day we would discuss it.  We wanted to see how far we got in
12   jury selection.  We are going to tell him right now.
13          THE COURT:  Why don't you do it.  Let me eavesdrop.
14   Go ahead.
15          MR. SCOTTEN:  So far all we can tell you, your Honor,
16   is likely tomorrow.
17          One of the complications, your Honor, but --
18          THE COURT:  This doesn't sound like an answer.
19          MR. SCOTTEN:  It's an answer.
20          THE COURT:  Not a good one.
21          MR. SCOTTEN:  It's not a concrete one.  We have an
22   issue with several witnesses who are -- there's a lot of
23   witnesses in this case flying in from out of town.
24          THE COURT:  What are the defendants supposed to do in
25   terms of getting ready for cross-examination?

|   |   |
|---|---|
| 1 | MR. SCOTTEN:  I can lay it out.  They can know what we |
| 2 | know.  I am happy to share with them what we know, as far as we |
| 3 | know. |
| 4 | THE COURT:  But they don't know who to prepare for |
| 5 | cross-examination for? |
| 6 | MR. SCOTTEN:  They have a pretty good idea.  If the |
| 7 | Court wants me to give it openly or to them, we can do it right |
| 8 | now. |
| 9 | THE COURT:  Speak to defense counsel and I will just |
| 10 | eavesdrop, but loud enough so I can hear. |
| 11 | MR. VELAMOOR:  There may be a miscommunication. |
| 12 | THE COURT:  Speak so we get this on the record. |
| 13 | MR. VELAMOOR:  We intend to call Mr. Hamner, Richard |
| 14 | Hamner first.  If there is additional time tomorrow, we intend |
| 15 | to call Adrian Rubin after that.  If Mr. Hamner takes us to the |
| 16 | end of the day, we have problems with Kelly Rogers.  With her, |
| 17 | she is a single mother.  She has serious issues that limits her |
| 18 | time.  So we intend to start Wednesday morning with her |
| 19 | regardless of how we end up on Tuesday. |
| 20 | THE COURT:  That's pretty concrete. |
| 21 | Here is the question.  How long does the government |
| 22 | think -- how long do you think that you would like to take for |
| 23 | your opening statement? |
| 24 | MR. SCOTTEN:  About 21, 22 minutes right now.  So say |
| 25 | 25. |

1           THE COURT:  That's a pretty precise answer.

2           Mr. Ginsberg.

3           MR. GINSBERG:  Mr. Ginsberg is not giving the opening

4    statement.

5           MR. ROTH:  He has deferred to me, Judge.  Around 30,

6    35 minutes, at the most.

7           THE COURT:  Mr. Bath.

8           MR. BATH:  30 or under.

9           MR. GINSBERG:  Unfortunately, there is one more issue.

10          At the end of the pretrial conference the other day,

11   if you recall, we had a discussion about what the government

12   referred to as a summary witness with some summary charts.  We

13   have not received any 3500 material as to that summary witness

14   or the summary material.  The Court ordered the government to

15   turn over what they had at this point and that had been

16   compiled during the last 10, 12 days, something like that.  The

17   government made it appear, at least to my ears, as if it was

18   something that was being done recently, and they were beginning

19   to compile it, and they were going to get some reports done.

20          We then received Friday night by a link about 250

21   pages of charts, reports, summaries from a forensic accounting

22   firm that's been working on this summary chart material for the

23   last two years.  It includes e-mails back and forth from the

24   forensic accountants to the U.S. attorneys saying, we have

25   completed this portion so far, we have this summary done so

1   far, we have this report done so far, we are awaiting other
2   materials so we can update it.  It's not at all, in my view,
3   the way it was portrayed the other day, number one.
4           Number two, they could have turned this over the day
5   they were supposed to turn over the rest of the 3500 material
6   so we wouldn't have wasted ten days without being able to give
7   it to our forensic accountant, who they made a big fuss about.
8   I don't want to go beyond that because this, to me, goes past
9   sharp practice into some other realm that I don't want to name,
10  but this is not how we practice law in the federal court in
11  serious criminal cases.
12          THE COURT:  When did the government represent they
13  were going to turn over their 3500 material?
14          MR. GINSBERG:  August 28, your Honor.
15          THE COURT:  Do you want to respond, please?
16          MR. VELAMOOR:  I do, your Honor, absolutely.
17          I think the discussion at the pretrial conference was
18  very different than that.  That's certainly not my
19  recollection.  I made clear in response to the Court's
20  questions that we were intending to turn over our initial draft
21  of the summary charts on the Friday, and we did that.  I also
22  made clear that there would be previous versions of some of the
23  work that were done prior to the 21-day rule I think that the
24  Court set.  I made both of those things clear.  I also
25  explained at the time that we were still figuring out what was

1   going to be included or not included in the charts, and so we
2   didn't know what to get from before to include, what would turn
3   out to be actually previous drafts and what was actually in
4   what we intend to offer through the summary witness.
5        I am very confident that I did not misrepresent or say
6   anything inaccurate with what we did.  And I am completely
7   confident what we did was completely appropriate.  Just for the
8   record, we notified the defense in March that we intended to
9   call someone from RGL, a forensic accounting firm, as a summary
10  witness in this case, and we invited the defense to offer any
11  objections to our use of a forensic accountant for summary
12  purposes.
13       THE COURT:  I don't think that's where this is headed
14  at the moment.  That's not the precise complaint here.  The
15  complaint here is much of the material that you're turning over
16  as 3500 material, which you should have turned over, in the
17  defense's view, at a date -- what date in August was it?
18       MR. GINSBERG:  28th.
19       THE COURT:  Is only being turned over on September 9.
20  That's the gist of the complaint.  And while it might not have
21  been your final version of charts, it may have been something
22  that still needed some last-minute polishing up to the last
23  minute, that you had the wherewithal to make a substantial
24  production back on the 28th, but didn't do so.
25       Mr. Ginsberg, is that your complaint?

            MR. GINSBERG:  That is my complaint.  I think this
issue is going to go further because I think what the
government is attempting to do, from my quick review of this
and sending it to our accountant, is that they are going to
attempt to call a forensic accountant and call that a fact
witness, as opposed to a witness giving an opinion, even
though -- it's our view from the material we see -- it is a
compilation of facts which is then turned into an analysis and
an opinion, but that's for a later date.
            MR. VELAMOOR:  This was the thinking.  This forensic
accounting firm has done a tremendous amount of work for us
over a long time.  Most of it is entirely unrelated to anything
we intend to use this person for as a summary witness.
            THE COURT:  Hang on a second.  August 28.  I got it.
If we are talking last November, maybe it hadn't taken shape.
But the general parameters of what you're going to use the
accounting witness for you had to know by August 28, no?
            MR. VELAMOOR:  We certainly knew we are intending to
show spending from travel bank accounts; we are intending to
show in some sense the volume of customers and where they came
from, certainly.  But to be clear, we turned over, as it
happened, a draft that's actually usable, that lays out in
quite clear detail exactly the kinds of spending, the kinds of
information that we intend to summarize and offer through the
summary witness the Friday before trial.

1          We intend to call this summary witness towards the end
2   of our case.  We are not off to a tremendously fast start given
3   some of the jurors' obligations.  We don't expect this witness
4   to take the stand for at least two weeks.  There was certainly
5   no intention to hide the ball, nor can it be said that there is
6   any kind of limitation on the defense ability to digest this
7   material.
8          THE COURT:  This exhibit that you're talking about
9   that lays everything out, did you not have a draft of it at an
10  earlier point in time, as of August 28?  Couldn't you have
11  produced your draft?  This is subject to revision.
12         MR. VELAMOOR:  I suppose we could have caused an
13  actual draft to be finalized and sent to us.  We did not do
14  that.  Our concern was if we offer something that was going to
15  be supplemented in substantial ways, it was ultimately going to
16  include additional areas of analysis, that it would bite us in
17  the other direction.
18         THE COURT:  So you're representing to me that you did
19  not have such a draft as of August 28, although you're candidly
20  saying, I suppose we could have asked for one, but you didn't
21  in fact have one, is that what you're representing?
22         MR. VELAMOOR:  Correct.  I could have had a draft
23  generated.  We did not do that.
24         THE COURT:  Mr. Ginsberg.
25         MR. GINSBERG:  So I am holding in my hand two pieces

1     of paper.  One is entitled "RGL Forensics" on the top.  In the
2     middle of the page it says, "Kansas/payday loan/update, August
3     25, 2014, RGL, strictly confidential," which is the front page
4     of an analysis and report that was contained in the material
5     that we received on Friday.
6              THE COURT:  The question is whether the government had
7     that in its possession.
8              MR. GINSBERG:  It was dated August 25, 2014.
9              THE COURT:  I understand it's dated that day, but
10    whether they had it.
11             MR. GINSBERG:  I have an e-mail, which is dated 2013,
12    which is written between the government and somebody at RGL.
13    "Re: Kansas loan fraud investigation, master file account
14    review, additional bank accounts identified."  And it says,
15    "Please use the attached schedules, and disregard the prior
16    schedules, as we have had to make changes to the notes and some
17    of the headings.  Thank you."  And it's signed by Kimberly
18    Espinoza, CPA, at RGL.
19             THE COURT:  Dated when?
20             MR. GINSBERG:  This is dated December 19, 2013.
21             So whatever they want to call it, in whatever form,
22    this has been going on for three, four years.  They had some
23    type of fairly final set of material by August 28th of this
24    year.  Because I have looked through this as best as I could in
25    the time that I have had, and there is a lot of material that

1  goes back to 2013, 2014, that may not have been in final form,
2  but was close enough in form that it should have been turned
3  over on August 28 and then we could have sorted the rest of it
4  out.

5         MR. VELAMOOR:  Judge, I made clear that absolutely RGL
6  did work prior to this date, and that taking a broad view of
7  3500 material, there would be things that they did previously
8  that would follow in the scope of 3500.  But what he is holding
9  up is by no means in any way a draft of any of the slides or
10 charts that we intend to offer in this case.  That is a tracing
11 analysis that was essentially the first and early stage in
12 trying to figure out how much payday lending money we can
13 ultimately seize and obtain seizure warrants for when we
14 indicted the case.  That is a different analysis.  I understand
15 it relates to the issue of spending from travel accounts, and
16 so it was turned over, but that is in no way a draft of the
17 slides that we intend to offer to the jury in this case.

18        THE COURT:  I have heard both sides on this issue.  At
19 the present time, I am not going to do anything based on the
20 government's representation that they are calling this witness
21 late in their case.  There may be other relief that I may grant
22 to the defendant, and it's not necessarily dependent upon
23 whether there was some wrongdoing or misconduct, but as a trial
24 judge I always have tools available to me if I feel that there
25 is any potential unfairness in the sequence of events, even if

1   innocent.  So I am not going to do anything, but I do
2   appreciate you bringing it to my attention, and I will see you
3   all tomorrow at 10:00.
4           Thank you.
5           (Adjourned to September 12, 2017, at 10:00 a.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25